David Tykulsker, Esq. (2609)
David Tykulsker & Associates
161 Walnut Street
Montclair, NJ  07042
(973) 509-9292 (office)
(973) 509-1181 (Fax)
david@dtesq.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEDIEVAL TIMES U.S.A., INC., | Case No. 2:22-cv-06050 (WJM) (ESK) |
| Plaintiff, | |
| v. | |
| MEDIEVAL TIMES PERFORMERS UNITED, and AMERICAN GUILD OF VARIETY ARTISTS, | Motion Return Date: February 6, 2023 |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

ALLEGATIONS OF THE COMPLAINT ............................................................... 3

ARGUMENT ........................................................................................................... 6

I.      As the alleged infringement neither occurs "in commerce" nor creates any likelihood of confusion, Plaintiff fails to plausibly allege a violation of the Lanham Act. .................................................................................... 6

II.     The Norris-LaGuardia Act deprives this Court of jurisdiction to provide the requested injunctive relief ................................................... 14

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
 237 F.3d 198 (3d Cir. 2000)....................................................................... 6, 8, 13

American Federation of Musicians v. Carroll,
 391 U.S. 99, 20 L. Ed. 2d 460, 88 S. Ct. 1562 (1968) ...................................... 16

Ashcroft v. Iqbal,
 556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................ 14 n.4

Care One Mgmt. LLC v. United Healthcare Workers E.,
 43 F.4th 126 (3d Cir. 2022)........................................................... 13 n.4, 14 n.4

Cellco Partnership v. Communication Workers of America,
 2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003) ........................................ 7

Checkpoint Sys. v. Check Point Software Techs., Inc.,
 269 F.3d 270 (3d Cir. 2001).................................................................................. 8

Cintas Corp. v. UNITE HERE,
 601 F. Supp. 2d 571 (S.D.N.Y. 2009),
 aff'd, 355 F. App'x 508 (2d Cir. 2009) ............................................... 8-9, 10, 13

Dranoff-Perlstein Assocs. v. Sklar,
 967 F.2d 852 (3d Cir. 1992).................................................................................. 8

In re Energy Future Holdings Corp.,
 990 F.3d 728 (3d Cir. 2021)......................................................................... 2 n.1

Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 100 v. E.
Airlines Inc.,
 826 F.2d 1141 (1st Cir. 1987) ............................................................................ 15

Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.,
 103 F.3d 196 (1st Cir. 1996).................................................................... 9, 11, 12

Lucky Stores, Inc. v. Int'l Bhd. of Teamsters Local Nos. 70, 78, 150, 409,
    812 F. Supp. 162 (N.D. Cal. 1992) .................................................................... 17

Marriott Corp. v. Great America Services Trades Council, AFL-CIO,
    552 F.2d 176 (7th Cir. 1976) ........................................................... 15, 16, 18, 19

Murray v. Cable NBC,
    86 F.3d 858 (9th Cir. 1996) ......................................................................... 13 n.3

Pension Benefit Guar. Corp. v. White Consol. Indus.,
    998 F.2d 1192 (3d Cir. 1993) ...................................................................... 2 n.1

S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,
    181 F.3d 410 (3d Cir. 1999) ......................................................................... 2 n.1

Senco Prods. v. Int'l Union of Elec., Radio & Machine Workers,
    311 F. Supp. 590 (S.D. Ohio 1970) .................................................. 9, 10, 17, 18

Sensient Techs. Corp. v. SensoryEffects Flavor Co.,
    613 F.3d 754 (8th Cir. 2010) ............................................................................... 7

Silgan Containers LLC v. Int'l Ass'n of Machinists & Aero. Workers,
    2018 U.S. Dist. LEXIS 191308 (E.D. Wis. Nov. 8, 2018) .. 8, 9, 10, 12, 13, 17,
18

WHS Ent. Ventures v. United Paperworkers Int'l Union,
    997 F. Supp. 946 (M.D. Tenn. 1998) ...................................................... 9, 11, 12

## Statutes

Lanham Act
    15 U.S.C. § 1114 ........................................................................................... 5, 6
    15 U.S.C. § 1125(a)(1)(A) ............................................................................. 5, 6

Norris-LaGuardia Act
    29 U.S.C. § 101 ............................................................................................... 14
    29 U.S.C. § 106 ........................................................................................ 13 n.4

Defendants American Guild of Variety Artists ("AGVA") and Medieval Times Performers United ("MTPU") (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss the Complaint ("Compl.") of Plaintiff Medieval Times U.S.A., Inc. ("Plaintiff" or "Medieval Times") under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

By filing this trademark lawsuit, Plaintiff seeks to weaponize the federal courts in retaliation against workers who have unionized and against the labor union that assisted those workers' efforts.  In May 2022, AGVA filed a petition with the National Labor Relations Board ("NLRB") seeking to represent certain workers at the Medieval Times facility in Lyndhurst, New Jersey.  The NLRB subsequently conducted a secret ballot election in July 2022 at which the workers selected AGVA as their exclusive collective bargaining representative, and AGVA was certified as such by the NLRB.  Later that month, AGVA filed another petition with the NLRB seeking to represent workers at the Buena Park, California Medieval Times location.  AGVA has now also been certified by the NLRB as the exclusive collective bargaining representative of the Buena Park workers.  But prior to the Buena Park unionization vote, Plaintiff filed this trademark action in a transparent effort to retaliate against the unionization efforts and to chill workers at

other Medieval Times locations from exercising their rights under federal labor law to organize a union.[1]

Plaintiff is not the first company to attempt to abuse federal trademark law in response to union activity. Courts around the country have routinely dismissed complaints by other companies that have alleged that a labor union's use of the company's trademark in connection with an organizing effort or other labor dispute ran afoul of trademark law. Typically, courts have held that employers have failed to state a claim because a union's use of an employer's mark in a labor dispute is not "use in commerce" and/or the union's use of the mark not likely to cause confusion. The Court must dismiss the Complaint here for the same reasons.

Further, Plaintiff's request to enjoin the alleged use of its mark necessarily fails because the Norris-LaGuardia Act deprives this Court of subject matter jurisdiction to grant such relief. The Norris-LaGuardia Act provides that a federal court does not possess jurisdiction to issue injunctions in cases involving or

---

[1] Defendants request that the Court take judicial notice of the petitions and the certifications of representative from NLRB Case Nos. 22-RC-296686 and 21-RC-300023. Copies of these administrative records are attached hereto as Exhibits 1-4 to the Certification of David Tykulsker. In considering a 12(b)(6) Motion to Dismiss, the Court may consider these Exhibits as matters of public record. See, e.g., In re Energy Future Holdings Corp., 990 F.3d 728, 737 (3d Cir. 2021) ("Generally, when deciding a motion to dismiss, only the complaint can be considered. But, 'a court may properly look at public records. . . , in addition to the allegations in the complaint.'", quoting S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999); accord, Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).)

growing out of a labor dispute.  Here, this case plainly involves and grows out of an effort to organize workers who work at Medieval Times facilities, and as such, Plaintiff's request for injunctive relief must be denied.

## ALLEGATIONS OF THE COMPLAINT

Plaintiff alleges that it and its subsidiaries own and operate "Medieval-style castles located throughout the United States," at which Plaintiff hosts "medieval-themed dinner theater performances" for customers who purchase tickets for admission.  (Compl. ¶¶ 4, 5, 14.)  Plaintiff alleges that it provides its services under the MEDIEVAL TIMES mark, which it alleges is registered with the United States Patent and Trademark Office.  (Id. ¶¶ 23-24.)

Plaintiff alleges that, upon information and belief, MTPU, "represented by and in conjunction with AGVA, provides organizational services on behalf of its members with the aspiration of engaging in collective bargaining, as well as other products and services" using Plaintiff's mark.  (Id. ¶ 32.)  Plaintiff alleges that MTPU's name "knowingly coopts the entirety of" Plaintiff's mark.  (Id. ¶ 31.)

Plaintiff alleges that MTPU's use of the Medieval Times name on its website and logo, along with "old script style text," a castle, and swords are "clearly meant to evoke Medieval Times' unique image."  (Id. ¶¶ 34-35.)  Plaintiff alleges that MTPU's logo and website also use the colors red and yellow, "which are the primary colors used by Medieval Times in its branding."  (Id. ¶ 36.)

3

Plaintiff alleges that MTPU "appropriates Medieval Times's Lyndhurst and Buena Park locations as its own" by simply referencing these locations on the MTPU website.  (Id. ¶ 37.)  Plaintiff alleges that a picture on MTPU's website of its members at work "[f]urther add[s] to the impression that [MTPU] is officially affiliated with Medieval Times."  (Id. ¶ 38.)

Plaintiff further alleges that MTPU uses the Medieval Times name, red and yellow colors, castles, swords, and a "scalloped border" on social media, and alleges that these elements resemble elements of Plaintiff's branding and décor at its locations.  (Id. ¶¶ 39-43.)  Plaintiff alleges that the MTPU Instagram page "advertises merchandise" with the MTPU logo "that, upon information and belief, [MTPU] is selling in interstate commerce."  (Id. ¶ 44.)

Attempting to connect MTPU's alleged use of Plaintiff's mark to AGVA, Plaintiff alleges that MTPU's website states that MTPU is "represented by AGVA" and contains an AGVA email address, (id. ¶ 47), and that AGVA's website contains news updates regarding MTPU, (id. ¶ 48).  In wholly conclusory fashion, Plaintiff alleges that "each of the Defendants was the agent, principal, alter ego, joint venturer, partner, and/or co-conspirator of each other Defendant in this action and, at all relevant times mentioned herein, was acting within the course and scope of such capacities and with the consent of the other Defendant."  (Id. ¶ 9; see also id. ¶ 49.)

Plaintiff further alleges that it did not consent to the alleged use of its mark by Defendants, and that the alleged use of Plaintiff's mark is "likely to cause confusion that Defendants have an affiliation, connection or association with Medieval Times or that Medieval Times sponsors or approves of the Medieval Times Performers Goods and Services." (Id. ¶¶ 50-51.)  Plaintiff speculates that the alleged use of Plaintiff's mark "could lead to the mistaken impression that [MTPU] is sponsored by Medieval Times, which could lead employees to believe that Medieval Times somehow requires its employees to become members of [MTPU]." (Id. ¶ 52.)  Continuing its chain of speculation, Plaintiff alleges that this mistaken impression "could subject Plaintiff to otherwise unwarranted claims arising under the National Labor Relations Act . . . or any other claims deriving from the actions of Defendants and their members." (Id.)

Plaintiff alleges two counts of trademark infringement under the Lanham Act against both MTPU and AGVA — the first count under 15 U.S.C. § 1114, and the second count under 15 U.S.C. § 1125(a)(1)(A). (Compl. ¶¶ 65-71.)  As remedies, Plaintiff seeks injunctive relief, that Defendants be required to file a written report with the Court setting forth its manner of compliance with any such injunctive relief, that Defendants be required to "make an accounting of all profits, gains, and advantages that Defendants have derived as a result of their unlawful

conduct, and that Defendants pay treble damages plus attorneys' fees and costs.

(Id., Prayer for Relief.)

## **ARGUMENT**

**I.      As the alleged infringement neither occurs "in commerce" nor creates any likelihood of confusion, Plaintiff fails to plausibly allege a violation of the Lanham Act.**

The Complaint must be dismissed because Plaintiff fails to plausibly allege any violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a)(1)(A).  (See Compl. ¶¶ 3, 57-71.)  The Third Circuit uses "identical standards" to analyze such claims.  See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."  Id.  For the purposes of this motion, Defendants are not disputing that Plaintiff has a valid and legally protectable mark, or that Plaintiff owns the mark.  However, as numerous courts have recognized, a labor union's use of an employer's name or mark in an organizing effort or other labor dispute is not use in commerce and is unlikely to cause confusion.  Accordingly, Plaintiff has failed to plausibly allege a violation of the Lanham Act, and the Complaint must be dismissed.

6

The Lanham Act explicitly requires the mark to be used "in commerce," and proof of its use "in commerce" is critical to the success of any such action.  See, e.g., Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754 (8th Cir. 2010).  In Cellco Partnership v. Communication Workers of America, 2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003), the court granted a union's motion to dismiss an employer's trademark claims in similar circumstances to the present case.  In Cellco, a union was in a labor dispute with Verizon over Verizon's potential laying off of the union-represented employees.  Id. at *2.  During the dispute, the union used the employer-plaintiff's "Can You Hear Me Now? Good" slogan as part of its media campaign.  Id.  The slogan was a registered trademark of Cellco Partnership, which did business as Verizon Wireless.  Id. at *1-2.  Cellco sued the union claiming, among other things, that its use of Cellco's trademarked slogan violated the Lanham Act.  Id. at *3.  The court dismissed the complaint, holding as a threshold matter that the union's "use of a slogan, owned by Cellco but associated with Verizon, during its labor dispute with Verizon as alleged, does not constitute 'use in commerce' necessary for incurring liability under the Lanham Act."  Id. at *25.  The court noted that a union's First Amendment right to comment on its employer adversary "could be jeopardized by an overly-broad construction of the Lanham Act."  Id. at *24 n.6.  The court further reasoned that the union used the slogan "as a means of bolstering its message as it attempted to

maintain its members' employment and negotiate the continued terms of their

employment with Verizon," and that use for such purposes was use in a labor

dispute, rather than use in commerce.  Id. at *11-12.  Here, similarly, the alleged

use of Plaintiff's mark is occurring in a labor dispute, rather than in commerce.

Accordingly, the Complaint must be dismissed because Plaintiff fails to plausibly

allege that its mark is being used in commerce.

The Complaint must also be dismissed on the independent basis that Plaintiff

fails to plausibly allege a likelihood of confusion, a necessary element for a

Lanham Act violation.  Checkpoint Sys. v. Check Point Software Techs., Inc., 269

F.3d 270 (3d Cir. 2001).  "A likelihood of confusion exists when 'consumers

viewing the mark would probably assume that the product or service it represents

is associated with the source of a different product or service identified by a similar

mark.'"  A&H Sportswear, 237 F.3d at 211 (quoting Dranoff-Perlstein Assocs. v.

Sklar, 967 F.2d 852, 862 (3d Cir. 1992)).  Courts have routinely held that a labor

union's use of an employer's trademark as part of communications during an

organizing campaign or other labor dispute is unlikely to cause confusion.  See

Silgan Containers LLC v. Int'l Ass'n of Machinists & Aero. Workers, 2018 U.S.

Dist. LEXIS 191308, at *9 (E.D. Wis. Nov. 8, 2018) (granting union's motion to

dismiss employer's trademark claim because "the court is convinced there is no

plausible likelihood of confusion"); Cintas Corp. v. UNITE HERE, 601 F. Supp.

2d 571, 579 (S.D.N.Y. 2009), aff'd, 355 F. App'x 508 (2d Cir. 2009) (granting union's motion to dismiss employer's trademark claim because "the likelihood that [the employer]'s actual or potential customers would be confused . . . is remote"); WHS Ent. Ventures v. United Paperworkers Int'l Union, 997 F. Supp. 946, 953 (M.D. Tenn. 1998) (granting union's motion to dismiss employer's trademark claim because employer could not show "that there is any likelihood of confusion from the Union's use of the [employer's] logo"); Senco Prods. v. Int'l Union of Elec., Radio & Machine Workers, 311 F. Supp. 590, 592 (S.D. Ohio 1970) (denying employer's request for injunction because "an innocent unsuspecting person, with even the most cursory examination of the handbills," would not "be likely to be confused").  Similarly, it has also been held that an employer's use of a union's mark in a labor dispute is unlikely to cause confusion.  See Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 206-07 (1st Cir. 1996) (finding "no colorable basis for a likelihood of confusion" where employer used union's mark on leaflets distributed during labor campaign).

Courts have relied on numerous factors that are present in this case to determine that there is no likelihood of confusion.  As a starting point, courts have noted that a union's use of an employer's mark to simply identify the employer it is trying to organize or with which it has a labor dispute is not confusing.  See Silgan Containers, 2018 U.S. Dist. LEXIS 191308, at *9 ("IAM is not using the SILGAN

trademark as a source identifier for its services or to sow confusion as to whether Silgan approves or is affiliated with IAM's efforts, but rather to identify Silgan as the employer of the employees IAM is attempting to unionize."); <u>Senco Prods.</u>, 311 F. Supp. at 592 ("It would be difficult for a union, giving the publicity that is specifically protected by the Act, to aught but name the employer."). Here, similarly, the alleged use of Plaintiff's mark is on its face being used to identify the workplace of the employees that are being organized. Thus, the alleged use of Plaintiff's mark is unlikely to cause confusion. [2]

Courts have commonly examined the content surrounding a union's use of an employer's mark and determined that there is no likelihood of confusion where the communications are critical of the employer. See <u>Silgan Containers</u>, 2018 U.S. Dist. LEXIS 191308, at *9-10 ("[I]t is not plausible that the relevant consumers— Silgan employees—are likely to confuse IAM's use of Silgan as a sign that Silgan endorses IAM's efforts given the content and other indentifying [sic] information on the Facebook page and Twitter account."); <u>Cintas</u>, 601 F. Supp. 2d at 579

---

[2] The confusion analysis must also consider the absurdity of Plaintiff's allegations that elements in the MTPU logo are meant to "evoke Medieval Times' unique image." (Compl. ¶ 35.) Castles and swords are generic medieval items that are not intrinsically associated with Plaintiff; indeed, the photographs included in the Complaint demonstrate that Plaintiff's facilities have such a wide array of medieval items and symbols (crowns, axes, jousting poles, crests, coats of arms, armor, helmets, etc.) that Plaintiff would be able to make the same allegations if any medieval-themed symbols were used in union campaign activities at all.

("Defendants' entire effort is directed at attacking Cintas. . . . Defendants are not using the 'CINTAS' mark as a 'source identifier', but rather solely to criticize Cintas's corporate practices."); WHS Ent. Ventures, 997 F. Supp. at 952 ("[N]o reasonable person would believe that one would purposefully distribute a flyer containing a listing of its health food violations . . . ."). Courts have applied the same approach when analyzing an employer's use of a union's mark. See Winship Green, 103 F.3d at 207 ("[T]he documents, when received, were affixed to clearly identifiable management propaganda.").

Here, even from the selectively chosen excerpts from MTPU's website and social media that Plaintiff included with its Complaint, it is plain that MTPU's alleged use of Plaintiff's mark is part of a labor dispute. The banner/cover photo alleged to be on the MTPU Facebook page reads: "UNITED FOR A FAIRER, SAFER, AND MORE ENJOYABLE WORKPLACE AT MEDIEVAL TIMES." (Compl. ¶ 40.) The caption on the Instagram post displaying a t-shirt with the MTPU logo describes the "union movement at the Buena Park castle" and uses the hashtags #unionstrong, #unionsforall, #labormovement, and #solidarity. (Id. ¶ 44.) The website states that "Medieval Times actors, stunt performers, and stable hands are joining together in union." (Id. ¶ 34.) And MTPU repeatedly describes itself as union on its website. (Id. ¶ 37.) Thus, it is not plausible that consumers are likely to confuse MTPU's alleged use of Plaintiff's mark as a sign that Plaintiff

11

endorses MTPU's efforts given the content and other identifying information on the website and social media.  See Silgan Containers, 2018 U.S. Dist. LEXIS 191308, at *9-10 ("[I]t is not plausible that the relevant consumers—Silgan employees—are likely to confuse IAM's use of Silgan as a sign that Silgan endorses IAM's efforts given the content and other indentifying [sic] information on the Facebook page and Twitter account.").  No reasonable person would think that Plaintiff is criticizing its own workplaces for not being fair, safe, or enjoyable. See Cintas, 601 F. Supp. 2d at 579 ("Defendants' entire effort is directed at attacking Cintas. . . . Defendants are not using the 'CINTAS' mark as a 'source identifier', but rather solely to criticize Cintas's corporate practices."); WHS Ent. Ventures, 997 F. Supp. at 952 ("[N]o reasonable person would believe that one would purposefully distribute a flyer containing a listing of its health food violations . . . .").  Accordingly, Plaintiff has failed to plausibly allege a likelihood of confusion.

Courts have also recognized that there is little likelihood of confusion where an employer or union uses the other party's mark during a unionization campaign because unions do not offer a product or service that competes with the employer that is being organized.  See Winship Green, 103 F.3d at 204 ("Because the parties do not offer competing services, there is no similitude."); Silgan Containers, 2018 U.S. Dist. LEXIS 191308, at *9 ("IAM is not offering a competing product or

service . . . ."); <u>Cintas</u>, 601 F. Supp. 2d at 579 ("[T]here is no proximity between the parties' goods or services.").  Here, similarly, Plaintiff does not allege that there is any proximity between the parties' goods or services.  Accordingly, this further demonstrates that there is no plausible likelihood of confusion.[3]

Further, a plaintiff's failure to allege or provide evidence of actual confusion also weighs against a finding of likelihood of confusion.  <u>See Silgan Containers,</u> 2018 U.S. Dist. LEXIS 191308, at *9 ("Silgan has not alleged nor provided any evidence of instances of actual confusion in its complaint."); <u>see also</u> <u>A&H</u> <u>Sportswear</u>, 237 F.3d at 211 (listing "evidence of actual confusion" as one of the factors in determining whether there is a likelihood of confusion).  Here, Plaintiff has also not alleged any evidence of actual confusion.  This further weighs in favor of dismissal.[4]

---

[3] This is a specific example of a larger principle.  <u>See, e.g.</u>, <u>Murray v. Cable NBC</u>, 86 F.3d 858, 861 (9th Cir. 1996) ("If goods or services are totally unrelated, there is no infringement because confusion is unlikely.").  Here, the services of a labor union and that of an entertainment company are sufficiently unrelated that confusion is unlikely.

[4]  An independent basis for dismissal of the Complaint as against AGVA is that Plaintiff's allegations of unauthorized use of Plaintiff's mark concern alleged activity by MTPU, rather than by AGVA.  (<u>See generally</u> Compl. ¶¶ 31-46.)  "[A] labor union cannot be held liable for the actions of its members (even if those members are officers of the union) absent 'clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.'"  <u>Care One Mgmt. LLC v. United Healthcare Workers E.</u>, 43 F.4th 126, 140 (3d Cir. 2022) (quoting 29 U.S.C. § 106).  Notably, Plaintiff has not alleged that anyone involved in MTPU's alleged use of Plaintiff's mark is a

## II.   The Norris-LaGuardia Act deprives this Court of jurisdiction to provide the requested injunctive relief.

Plaintiff's request to enjoin the alleged use of its mark necessarily fails because the Norris-LaGuardia Act deprives this Court of subject matter jurisdiction to grant such relief.  The Norris-LaGuardia Act provides that a federal court does not possess "jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute," and shall not issue an injunction that is "contrary to the public policy declared in this chapter." 29 U.S.C. § 101.  The instant case plainly involves and grows out of an effort to

---

member, employee, or officer of AGVA.  For that reason alone, Plaintiff's claims against AGVA must fail.  Plaintiff's allegation that "each of the Defendants was the agent, principal, alter ego, joint venturer, partner, and/or co-conspirator of each other Defendant in this action and, at all relevant times mentioned herein, was acting within the course and scope of such capacities and with the consent of the other Defendant," (Compl. ¶ 9; see also id. ¶ 49), are wholly conclusory and thus "are not entitled to the assumption of truth" on a motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).  Moreover, even if assumed to be true, these allegations are not sufficient to plausibly allege liability under the heightened Care One standard.  See 43 F.4th at 139-41.

Plaintiff's minimal factual allegations in support of its agency argument — that MTPU's website says to contact an AGVA email address with "questions about organizing a union in your Medieval Times workplace," (Compl. ¶ 47), and that AGVA's website "shares news updates regarding [MTPU]," (id. ¶ 48) — fall woefully short of plausibly pleading agency status or plausibly alleging AGVA's participation in, authorization of, or ratification of MTPU's alleged use of Plaintiff's mark.  Further, Plaintiff's allegation that the MTPU website and logo state that MTPU is represented by AGVA, (id. ¶ 47), makes the precise opposite point of what Plaintiff is arguing — it suggests that AGVA acts in a representative capacity on MTPU's behalf, not that MTPU acts on AGVA's behalf.

14

organize workers who work at Medieval Times facilities, and as such, this request must be denied.

The Norris-LaGuardia Act broadly defines labor disputes to include "any controversy . . . concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). The Norris-LaGuardia Act's policy against judicial intervention in labor disputes is so strong that "not even the specter of a national paralysis . . . [is] considered sufficient to overcome Congress' withdrawal of jurisdiction."  Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 100 v. E. Airlines Inc., 826 F.2d 1141, 1145 (1st Cir. 1987) (internal citations omitted).

A labor organization's use of an employer's mark in an organizational campaign is a clear example of a "labor dispute" within the meaning of the Norris-LaGuardia Act.  In Marriott Corp. v. Great America Services Trades Council, AFL-CIO, 552 F.2d 176 (7th Cir. 1976), several labor organizations were attempting to organize workers at Marriott's Great America amusement park, using the name "Great America Service Trades Council" in their promotional efforts. Id. at 178.  After Marriott filed suit under the Lanham Act over the labor organizations' use of the marks "Great America" and "Marriott Great America,"

15

the Seventh Circuit held that issuance of an injunction was barred by the Norris-LaGuardia Act.  Id. at 177.

The Marriott court began by taking direction from American Federation of Musicians v. Carroll, 391 U.S. 99, 20 L. Ed. 2d 460, 88 S. Ct. 1562 (1968), an antitrust case in which the Supreme Court instructed that in determining whether the Norris-LaGuardia Act bars an injunction, it is "necessary to inquire beyond the form or appearance of a dispute to its 'relative impact on . . . the interests of union members.'"  552 F.2d at 179 (quoting Carroll, 391 U.S. at 107.).  The Marriott court noted that "the controversy in the instant case, although couched in terms of trademark infringement by Marriott, does, in fact, concern the 'association or representation' of its employees and prospective employees with respect to 'conditions of employment.'" 552 F.2d at 179.  The Seventh Circuit continued:

> [I]t can readily be perceived that, whatever the merits of plaintiff's Lanham Act and other trademark claims, this dispute has a great impact on the interests of the unions, their members, and potential members.
>
> The organizational efforts of the unions to achieve representation of Marriott's workers are the foundation of this dispute.  The request for injunctive relief was directed against the Council's choice of name, which is intertwined with those efforts, legitimate labor objectives.  The choice of a particular name by a labor organization may very well facilitate its organizational drive to represent the employees of a particular employer.  The name may serve to identify and publicize the employer which is the target of the campaign and to instill a measure of collective identity among employees.  Such aims are legitimate union objectives in seeking the right to self-organization of employees under section 7 of the Labor-Management Relations Act.

Id. at 179-80.

Other federal courts that have been presented with this issue have reached the same conclusion as the Seventh Circuit in Marriott.  See, e.g., Silgan Containers, 2018 U.S. Dist. LEXIS 191308, at *7 ("[A] labor organization's name helps foster a collective identity and depriving IAM the use of Silgan's name would interfere with legitimate union objectives.  While it may not be Silgan's intention to interfere with IAM's organization efforts through enforcement of its trademarks, here interference is unavoidable. As a result, this court does not have subject matter jurisdiction over Silgan's prayer for injunctive relief and those claims are dismissed."); Lucky Stores, Inc. v. Int'l Bhd. of Teamsters Local Nos. 70, 78, 150, 409, 812 F. Supp. 162, 163 (N.D. Cal. 1992) (finding labor unions' use of the employer's mark in the context of a boycott to be "inextricably linked with the underlying labor dispute," thereby depriving the court of jurisdiction to consider motion for preliminary injunction); Senco Prods., 311 F. Supp. at 592 ("So long as the employer's name is used in such a way that the casual reader would clearly understand that it was the Union and not the employer issuing the publicity, it would seem clear that the Norris-LaGuardia Act would prohibit this Court from issuing an injunction in the present context of this [labor organizing] dispute.").

The material facts in the instant case are nearly identical to those in <u>Marriott</u>, <u>Silgan</u>, and <u>Senco</u> — the alleged use of Plaintiff's mark is rooted in a labor organizing drive.  Plaintiff alleges that the MTPU, "represented by and in conjunction with AGVA, provides organizational services . . . with the aspiration of engaging in collective bargaining." (Compl. ¶ 32.)  Plaintiff further alleges that that MTPU uses Plaintiff's mark in MTPU's "promotional efforts;" that is, in its efforts to promote its aforementioned goal of engaging in collective bargaining. (<u>Id.</u> ¶ 33.)  Indeed, one of the screenshots included in the Complaint that allegedly reflects MTPU's website contains the text "Medieval Times actors, stunt performers, and stable hands are joining together in union" below the MTPU logo. (<u>Id.</u> ¶ 34.)  The Complaint even demonstrates that one of Plaintiff's chief concerns is that Defendants' alleged use of Plaintiff's mark "could lead employees to believe that Medieval Times somehow requires its employees to become members of Medieval Times Performers." (<u>Id.</u> ¶ 52.)

A union incorporating an employer's mark in the union's own name and in its promotional materials as part of an organizing campaign, as is alleged here, "may serve to identify and publicize the employer which is the target of the campaign and to instill a measure of collective identity among employees.  Such aims are legitimate union objectives in seeking the right to self-organization of employees under section 7 of the Labor-Management Relations Act." <u>See</u>

Marriott, 552 F.2d at 179-80.  As this case is deeply intertwined with a labor dispute within the meaning of the Norris-LaGuardia Act, this Court has no jurisdiction to issue the injunctive relief requested, and Plaintiff's request must be denied.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed and the request for injunctive relief should be denied.

Respectfully submitted,

_____/s/ David Tykulsker____
David Tykulsker & Associates
161 Walnut Street
Montclair, NJ  07042
(973) 509-9292
(973) 509-1181 (Fax)
david@dtesq.com
Attorneys for Defendants

Dated:  December 27, 2022

19



⚠ Caution
As of: December 27, 2022 9:36 PM Z

# *Cellco P'ship v. Commun. Workers of Am.*

United States District Court for the District of New Jersey

December 11, 2003, Filed; December 11, 2003, Entered

CIVIL ACTION NO. 02-5542 (MLC)

**Reporter**
2003 U.S. Dist. LEXIS 26823 *; 2003 WL 25888375

CELLCO PARTNERSHIP, Plaintiff, v. COMMUNICATION WORKERS OF AMERICA, Defendant.

**Notice:** [*1] NOT FOR PUBLICATION

## Core Terms

Lanham Act, slogan, trademark, unfair competition, labor dispute, commerce, alleges, advertising, common law, Counts, rights, Communications, motion seeking, defamation, restaurant, tortious interference, message, labor practice, injunctive, reputation, employees, dilution, merits

## Case Summary

### Procedural Posture

Plaintiff partnership sought relief under the Lanham Act, *15 U.S.C.S. § 1051 et seq.*, and New Jersey statutory and common law against defendant union. In particular, the partnership claimed unfair competition, defamation, and tortious interference with contractual relations. The union moved to dismiss.

### Overview

The partnership did business under a wireless carrier's name. The wireless carrier was involved in a labor dispute with the union. During its resulting media campaign, the union parodied the wireless carrier's slogan. This slogan was the registered trademark of the partnership. The partnership alleged that, because it was not a party to the labor dispute, the union's use of its trademarked slogan caused a likelihood of confusion and defamation, inter alia. The union used the trademark associated with the wireless carrier as a means of bolstering its message as it attempted to maintain its members' employment and negotiate the terms of their employment. Thus, the union did not "use in commerce" the trademark at issue, and the Lanham Act, specifically *15 U.S.C.S. § 1125(a)*, claims were dismissed. As the partnership failed to state a Lanham Act claim, it also failed to state claims under state unfair competition laws. As for defamation, the union did not make a false statement of fact, but merely highlighted a link that the partnership created between the wireless carrier and itself. Thus, any harm to the partnership's reputation arising from the labor dispute was self-inflicted.

### Outcome

The union's motion to dismiss the complaint was granted and the complaint was dismissed in its entirety.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN1*[⤓] Motions to Dismiss, Failure to State Claim

A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief can be granted does not attack the merits of the action, but merely tests the legal sufficiency of a complaint. A court may grant a motion to dismiss a complaint under *Rule 12(b)(6)* only if, accepting all alleged facts as true, the plaintiff is not entitled to relief. When considering such a motion, a

2003 U.S. Dist. LEXIS 26823, *1

court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. A court need not, however, credit "bald assertions" or "legal conclusions," nor should it accept "unwarranted inferences" when deciding a motion to dismiss.

Where the union's purpose in distributing flyers bearing a restaurant's name is not to advertise itself or its services, but to pressure an employer in a labor dispute, the union does not "use in commerce" the restaurant's logo and can not be held liable under either § 43(a) or (c) of the Lanham Act, *15 U.S.C.S. § 1125(a)* or *(c)*.

Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > False Designation of Origin

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act

*HN2*[ ] **Likelihood of Confusion, False Designation of Origin**

See *15 U.S.C.S. § 1125(a)*.

Trademark Law > Causes of Action Involving Trademarks > Dilution of Famous Marks > General Overview

*HN3*[ ] **Causes of Action Involving Trademarks, Dilution of Famous Marks**

The Lanham Act provision addressing trademark dilution, *15 U.S.C.S. § 1125(c)*, refers to "use in commerce," and includes a defense excepting "noncommercial use of a mark" from that section's coverage.

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > General Overview

*HN4*[ ] **Federal Unfair Competition Law, Lanham Act**

See *15 U.S.C.S. § 1127*.

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > General Overview

*HN5*[ ] **False Advertising, Lanham Act**

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > General Overview

*HN6*[ ] **False Advertising, Lanham Act**

Although the "act of negotiating on behalf of union members" could be considered a "service," a court has reasoned that this activity is too far removed from the "sale or advertising" of a union's services such as to fall under the Lanham Act, *15 U.S.C.S. § 1051 et seq.*

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act

Business & Corporate Compliance > ... > Federal Unfair Competition Law > Lanham Act > Scope

*HN7*[ ] **False Advertising, Lanham Act**

In determining Congress's intent in drafting the Lanham Act, *15 U.S.C.S. § 1051 et seq.*, the United States Court of Appeals for the Third Circuit has noted that the focus of the statute is on anti-competitive conduct in a commercial context and that its legislative history similarly shows this focus on commercial, anti-competitive conduct. It then noted that the Third Circuit's caselaw also recognizes the essentially commercial nature of the Lanham Act.

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act

Business & Corporate Compliance > ... > Federal Unfair Competition Law > Lanham Act > Scope

*HN8*[ ] **False Advertising, Lanham Act**

Where a union's speech has a commercial impact on a company - and is intended by the union to have such an

2003 U.S. Dist. LEXIS 26823, *1

impact - is without question, but this does not mean that the union's use of the company's slogan falls within that range of speech, whether characterized as "commercial" or not, that the Lanham Act, *15 U.S.C.S. § 1051 et seq.*, covers.

Constitutional Law > ... > Freedom of Speech > Commercial Speech > Boycotts & Picketing

*HN9*[↓] **Commercial Speech, Boycotts & Picketing**

The United States Supreme Court has observed the special status of speech in labor disputes: The interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the *First Amendment* when they express themselves on the merits of the dispute in order to influence its outcome. The Supreme Court knows of no requirement that, in order to avail themselves of *First Amendment* protection, the parties to a labor dispute need address themselves to the merits of unionism in general or to any subject beyond their immediate dispute.

Governments > Legislation > Interpretation

*HN10*[↓] **Legislation, Interpretation**

Where an otherwise acceptable construction of a statute would raise serious constitutional problems, a court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.

Copyright Law > ... > Civil Infringement Actions > Jurisdiction > Federal Court Jurisdiction

Trademark Law > ... > Infringement Actions > Jurisdiction > General Overview

*HN11*[↓] **Jurisdiction, Federal Court Jurisdiction**

The jurisdiction conferred on the federal courts by *28 U.S.C.S. § 1338(b)* is conditioned on a viable copyright or trademark claim arising under United States law.

Antitrust & Trade Law > ... > Trade Practices &

Unfair Competition > State Regulation > Scope

*HN12*[↓] **Trade Practices & Unfair Competition, State Regulation**

See *N.J. Stat. Ann. § 56:4-1*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

*HN13*[↓] **Trade Practices & Unfair Competition, State Regulation**

*N.J. Stat. Ann. § 56:4-1* is New Jersey's statutory equivalent of section *15 U.S.C.S. § 1125(a)(1)* of the Lanham Act, and violation of that section leads to a finding of liability under *§ 56:4-1*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

*HN14*[↓] **State Regulation, Claims**

The New Jersey unfair competition statute preserves the plaintiff's right to bring an unfair competition claim under New Jersey common law at *N.J. Stat. Ann. § 56:3-13.13*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

*HN15*[↓] **State Regulation, Claims**

See *N.J. Stat. Ann. § 56:3-13.13*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > General Overview

*HN16*[↓] **Trade Practices & Unfair Competition, State Regulation**

New Jersey's law of unfair competition is an amorphous area of jurisprudence. It knows of no clear boundaries. The concept is as flexible and elastic as the evolving standards of commercial morality demand. Yet, although it is impossible to categorize all acts which constitute unfair competition, there are a few

fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another - or property which has some sort of commercial or pecuniary value. The misappropriation usually takes the form of "palming off" another's goods as your own, although the modus operandi is not essential.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

Torts > Business Torts > Unfair Business Practices > General Overview

**HN17[⬇]  Trade Practices & Unfair Competition, State Regulation**

Except for the interstate commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by *15 U.S.C.S. § 1125* are the same.

Business & Corporate Compliance > ... > Causes of Action Involving Trademarks > Dilution of Famous Marks > State Antidilution Statutes

**HN18[⬇]  Dilution of Famous Marks, State Antidilution Statutes**

See *N.J. Stat. Ann. § 56:3-13.20.*

Torts > ... > Defamation > Elements > General Overview

Torts > Intentional Torts > Defamation > Procedural Matters

**HN19[⬇]  Defamation, Elements**

Whether a statement is defamatory under New Jersey law is a matter of law to be determined by the court. Generally, a statement is defamatory if it is false, is communicated to a third person and tends to harm the plaintiff's reputation or deters third persons from associating with the plaintiff.

Torts > Intentional Torts > Defamation > Libel

**HN20[⬇]  Defamation, Libel**

For a libel action to qualify, the disputed statement must be an assertion of fact. The alleged circumstances surrounding the publication must show that the statements were "of and concerning" the plaintiff. It must appear that a third person understands the statements to relate to the plaintiffs. However, the actual naming of a plaintiff is not a necessary element in an action for libel. It is enough that there is such reference to him that those who read or hear the libel reasonably understand the plaintiff to be the person intended.

Torts > ... > Contracts > Intentional Interference > Elements

**HN21[⬇]  Intentional Interference, Elements**

To establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference is inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference is without justification; and (4) that the interference causes damage.

Torts > ... > Contracts > Intentional Interference > Elements

**HN22[⬇]  Intentional Interference, Elements**

In the context of tortious interference with a contract, "malice" means that the harm is inflicted intentionally and without justification or excuse. The burden is on a plaintiff to demonstrate a lack of justification or excuse.

Constitutional Law > ... > Freedom of Speech > Commercial Speech > Boycotts & Picketing

**HN23[⬇]  Commercial Speech, Boycotts & Picketing**

Informational and "area standards" picketing and non-violent boycotts against the primary employer are *First Amendment* activities protected under the federal labor laws. The *First Amendment* protection enjoyed by peaceful pamphleteering is not diminished where the

communications are intended to exercise a coercive impact.

**Counsel:** For CELLCO PARTNERSHIP, Plaintiff: WILLIAM H. TROUSDALE, TOMPKINS MCGUIRE & WACHENFELD, ESQ., NEWARK, NJ.

For COMMUNICATIONS WORKERS OF AMERICA, Defendant: ROSEMARIE CIPPARULO, WEISSMAN & MINTZ, SOMERSET, NJ.

**Judges:** MARY L. COOPER, United States District Court Judge.

**Opinion by:** MARY L. COOPER

# Opinion

## MEMORANDUM AND ORDER

### COOPER, District Judge

This is an action seeking relief under the Lanham Act, *15 U.S.C. § 1051 et seq.,* and New Jersey statutory and common law. The matter now comes before the Court on the defendant's *Federal Rule of Civil Procedure ("Rule") 12(b)(6)* motion to dismiss the entire Amended Complaint for failure to state a claim on which relief can be granted. This Court will grant the motion.

### BACKGROUND

The plaintiff is Cellco Partnership ("Cellco"), which does business as "Verizon Wireless." (Am. Compl. P3.) Cellco is a joint venture general partnership between Verizon Communications Inc. ("Verizon") and Vodafone Group, Plc ("Vodafone"). (*Id.* PP2-4.) As of June 2000, Verizon owned 55% of Cellco. (Def. Weissman Certif., Ex. A.) [1]

 **[*2]** The defendant is the Communication Workers of America ("CWA"), a labor organization representing, through numerous collective bargaining agreements, some 700,000 communications and media workers, about 75,000 of whom work for Verizon. (*Id.* PP5-6.) The CWA, however, only represents about fifty Cellco employees. (*Id.* P7.)

---

[1] *See infra,* n.4 and accompanying text.

Verizon got into a labor dispute with the CWA in late 2002 over its potential laying off of CWA-represented employees. (*Id.* P8.) During its resulting media campaign against Verizon, the CWA parodied the Verizon Wireless slogan, "Can You Hear Me Now? Good." (*Id.* PP18-30, Exs. 2-12.)

Cellco is the registered trademark owner of the slogan. (*Id.* PP15-16.) Cellco has spent hundreds of millions of dollars promoting this slogan in the past two years through its "Test Man" advertisements, generating much publicity and goodwill for itself. (*Id.* PP13-17, Ex. 1.) Cellco alleges that, because it was not a party to the labor dispute between Verizon and the CWA, the CWA's use of its trademarked slogan has defamed it, if only by linking it to Verizon's supposed labor practices. (*Id.* PP18-42.) Cellco further alleges that the CWA created a likelihood of **[*3]** confusion that Cellco itself was responsible for or sponsored the CWA's messages, as shown by the actual confusion that these had allegedly caused among its own employees. (*Id.* PP18-42.)

Cellco filed its first Complaint on November 15, 2002 and sought injunctive relief on December 13, 2002. (Compl. & Pet. for TRO.) Cellco withdrew the latter request because the CWA stipulated that it had, as of December 15, 2002, stopped using the slogan. (Am. Compl. PP31-32 & Stip. Ord. 1-28-03.) The subsequent Amended Complaint, however, still demands injunctive relief. (Am. Compl. PP53-54.) Cellco alleges therein that the CWA, as recently as March 2003, has continued to use its slogan despite the stipulation. (*Id.* P31.)

Cellco alleges nine counts in its Amended Complaint arising from the CWA's use of its slogan. (*Id.* PP43-105.) The first four counts are brought under the Lanham Act. (*Id.* PP43-74.) Counts Five through Seven allege claims sounding in New Jersey's statutory or common law of unfair competition. (*Id.* PP75-90.) Count Eight alleges defamation. (*Id.* PP91-98.) Count Nine alleges tortious interference with contractual relations. (*Id.* PP99-105.) For the reasons **[*4]** stated below, the defendant's motion will be granted.

### DISCUSSION

I. *Applicable Standard Under Rule 12(b)(6).*

**HN1**[↑] ] A motion to dismiss under *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted does not attack the merits of the action, but merely tests the legal sufficiency of a complaint. *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987).* A court may grant a

motion to dismiss a complaint under _Rule 12(b)(6)_ "only if, accepting all alleged facts as true, the plaintiff is not entitled to relief." _Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986)_. When considering such a motion, a court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. _Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)_ ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."). A court need not, however, credit "bald assertions" or "legal conclusions," nor should it accept "unwarranted inferences" when deciding a motion to dismiss. _Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)._ **[*5]**

II. _Counts One Through Four: Lanham Act Violations_

The CWA argues that the Lanham Act does not apply to its use of Cellco's slogan because its use was "non-commercial." (Br. in Supp. of Mot. ("CWA Br.") at 9-28.) Cellco contends that the CWA's use of the slogan is not only commercial, but is actionable under the Lanham Act. (Br. in Opp. of Mot. ("Cellco Br.") at 6-24.)

The provision on which Cellco bases three of its four Lanham Act claims--_15 U.S.C. § 1125(a)_--states that:

**HN2[↑]** ] Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, **[*6]** or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**HN3[↑]** ] The provision addressing trademark dilution, _15 U.S.C. § 1125(c)_, Cellco's Count Four, also refers to "use in commerce," and includes a defense excepting "noncommercial use of a mark" from that section's

coverage. _15 U.S.C. § 1125(c)(4)(B)._

The Act's Definitions Section, _15 U.S.C. § 1127_, states:

**HN4[↑]** ] The word "commerce" means all commerce which may lawfully be regulated by Congress.
* * *
The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce -
(1) on goods when -

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, **[*7]** and
(B) the goods are sold or transported in commerce, and
(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

The threshold legal issue is whether the CWA's use of the slogan constitutes "use in commerce" under the Lanham Act. The Court must determine whether the CWA's use of a trademarked slogan during a labor dispute with the trademark holder's dominant and namesake parent company constitutes the sale or advertising of the CWA's own services in the ordinary course of its trade within commerce.

The CWA relies on a case wherein a district court dismissed a restaurant owner's Lanham Act claims against a union whose members had handed leaflets to patrons detailing the restaurant's past health code violations. _WHS Entm't Ventures v. United Paperworkers Int'l Union, 997 F. Supp. 946, 947-51 (M.D. Tenn. 1998)_ ("_WHS_"). (CWA Br. at 15-17, 23, 36 & CWA Reply Br. ("Reply Br.") at 3.) The leaflets included **[*8]** a parody of the restaurant's trademarked logo, a wild horse. _WHS, 997 F. Supp. at 948_ & n.1.

The _WHS_ court held that:

**HN5[↑]** ] the Union's purpose in distributing the

flyers bearing the Wildhorse Saloon restaurant was not to advertise itself or its services, but to pressure an employer in a labor dispute. Thus, the Union did not "use in commerce" the Wildhorse Saloon logo and could not be held liable under either §§ 43(a) or (c) of the Lanham Act [i.e., *15 U.S.C. §§ 1125(a)* or *(c)*].

*Id. at 951*. Although the court admitted that *HN6*[⬆] the "act of negotiating on behalf of union members" could be considered a "service," it reasoned that this activity was "too far removed from the 'sale or advertising' of the Union's services" such as to fall under the Lanham Act. *Id. at 950*.

The CWA also relies on *Lucasfilm, Ltd. v. High Frontier, 622 F. Supp. 931, 932-33 (D.D.C. 1985)*, wherein the plaintiff alleged that the defendants' use of the term "Star Wars" to describe the Strategic Defense Initiative violated its trademark rights. (CWA Br. at 34-35 & Reply Br. at 8-9.) In rejecting the plaintiff's [*9] request for injunctive relief, the court stated that "defendants' only activity is trying to communicate their ideas. Purveying points of view is not a service. Even if promoting of ideas was considered to be conducting an educational 'service,' television messages that are only used to express those ideas do not sell or advertise them." *Id. at 934*.

Cellco cites *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 89-93 (2d Cir. 1997)*, wherein a court contrued the definition of "use in commerce" broadly. (Cellco Br. at 19-20.) The Second Circuit noted that Lanham Act claims had been allowed in non-commercial settings, and that the statutory term "denotes Congress's authority under the *Commerce Clause* rather than an intent to limit the Act's application to profit-making activity." *Id. at 92-93*. The Second Circuit thus affirmed an order granting summary judgment and injunctive relief granted to a national political organization on its Lanham Act claims against a local breakaway chapter that had appropriated its trademarked name. *Id. at 93*. It distinguished *Lucasfilm* on such grounds, noting [*10] that if the *Lucasfilm* court had been "right that communicating ideas and purveying points of view is not a service subject to the controls established by trademark law, then one who established a learning center would be free to call it Harvard or Yale University." *Id. at 91*.

Cellco relies on a case that the *United We Stand* court had cited, *Brach van Houten Holding, Inc. v. Save Brach's Coalition for Chicago, 856 F. Supp. 472 (N.D. Ill.*

*1994*) ("*Brach's*"). (Cellco Br. at 9-10, 19 & 29-30.) The *Brach's* court enjoined a pressure group seeking to stop the plaintiff from closing a candy factory from using the plaintiff's logo in its literature. *Id. at 477*. One of the defendant group's component organizations was a union local. *Id. at 474*. The *Brach's* court stated that:

> in soliciting donations, preparing press releases, holding public meetings and press conferences, propounding proposals for the reorganization of Brach's ownership and/or management, and other activities designed to bring about change in the Brach's organization and enhance the stability of workers' jobs . . . such work on behalf [*11] of its members' interests constitutes a "service" within the meaning of the Lanham Act.

*Id. at 475-76*.

The *WHS* court distinguished the activity in *Brach's* from the leafletting before it, quoting this same language. *WHS, 997 F. Supp. at 951*. "In contrast, in the present case the Union's purpose in distributing the flyers bearing the Wildhorse Saloon restaurant was not to advertise itself or its services, but to pressure an employer in a labor dispute." *Id.* It was this distinction that led the *WHS* court to hold that the Union had not used the trademarked logo in commerce, and so could not be held liable under the Lanham Act. *Id.*

This Court will follow the approach taken in *WHS*, which sets, in our view, the correct boundary line to the Lanham Act in the context presented here. The CWA's use of Cellco's slogan occurred during a "labor dispute." [2] (Am. Compl. PP18-30.) As with the union in *WHS*, the CWA used a trademark associated with Verizon (although actually owned by "Verizon Wireless") as a

---

[2] The National Labor Relations Act ("NLRA") defines "Labor dispute" as "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." *29 U.S.C. § 152(9)*. Thus, only "rarely have courts found concerted union activities to fall outside this broad definition." *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655, 39 F.3d 191 (8th Cir. 1994)*. Where a union acts for some arguably job-related reason and not out of pure social or political concern, a "labor dispute" exists. *Hasbrouck v. Sheetmetal Workers Local 232, 586 F.2d 691, 694 n.3 (9th Cir. 1978)*.

means of bolstering its message as it attempted to maintain its members' employment and negotiate the continued terms of their **[*12]** employment with Verizon. (*Id.* Exs. 2-12.)

Cellco alleges that the ads were designed to "promote CWA's union services **[*13]** and membership development." (Am. Compl. P18.) However, this Court is not bound to the plaintiff's "bald assertions" or "legal conclusions" when deciding on a motion to dismiss. *Morse, 132 F.3d at 906*. Thus, as with the *WHS* court and for the same reasons, this Court will grant that part of the CWA's *Rule 12(b)(6)* motion seeking to dismiss Cellco's Lanham Act claims, Counts One through Four.

We acknowledge that Cellco has "commercial interests affected by the conduct at issue," and therefore possesses Lanham Act standing. See *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 229, 233-34 (3d Cir. 1998)*. Cellco may, as here, have Lanham Act standing, yet not state a claim under it. *HN7*] In determining Congress's intent in drafting the Act, the Third Circuit noted that "the focus of [the] statute is on anti-competitive conduct in a commercial context" and that its legislative history similarly shows this "focus on commercial, anti-competitive conduct." *Id. at 229*. It then noted that the Third Circuit's "caselaw also recognizes the essentially commercial nature of the Lanham Act." *Id.*

The District of Connecticut **[*14]** has held similarly. *See Sodexho USA, Inc. v. Hotel & Rest. Employees & Bartenders Union, 989 F. Supp. 169 (D. Conn. 1997)*. In granting the union's motion to dismiss under *Rule 12(b)(6)*, the *Sodexho* court stated:

> Defendants' actions presumably were intended to garner public support for the unions, generate public misgivings about Sodexho, and/or put pressure on Sodexho to take the unions seriously. The mere desire to exert economic pressure on a company, however, does not transform defendants' action into commercial speech, or make the defendants commercial competitors of plaintiff Sodexho. A [sic] environmental advocate might encourage consumers to avoid Company X because it pollutes the environment, and patronize Company Y, which is known to have good environmental policies. Such an action is certainly intended to have economic impact on Company X. It does not place the environmental advocate in competition with Company X, however. Even if the advocate claimed falsely that Company X is a polluter, that still does not transform the speech into

commercial speech for the purposes of the Lanham Act.

*Id. at 172*. The CWA's ads were likewise **[*15]** meant to "garner public support . . . generate public misgivings about [Verizon], and/or put pressure on [Verizon] to take [the CWA] seriously." *Id.*

*HN8*] That the CWA's speech has a commercial impact on Verizon--and was intended by the CWA to have such an impact--is without question. Contrary to Cellco's assertion, (Cellco Br. at 18), this does not mean that the CWA's use of its slogan falls within that range of speech, whether characterized as "commercial" or not, that the Lanham Act covers. *Jews for Jesus v. Brodsky, 993 F. Supp. 282 (D.N.J.)*, *aff'd without opinion, 159 F.3d 1351 (3d Cir. 1998)* is distinguishable. The *Jews for Jesus* defendant had set up a website with an intentionally-misleading domain name in order to divert people from the plaintiff's website. *Jews for Jesus, 993 F. Supp. at 290-91, 308*. However, the court held that such use was commercial because the defendant's website not only disparaged "Jews for Jesus" while using its trademarked name, but also kept the plaintiff from effectively using its own trademark. *Id. at 308*. That is not the case here: the CWA's use of "Can you hear me now? **[*16]** " does not prevent Cellco from using its own slogan.

The reasoning given in *United We Stand* further demonstrates that it is itself distinguishable from this case and underlines the inapplicability of the reasoning in *Jews for Jesus*: "The crucial difference between this case and those [cited by the defendant] is that UWSANY, unlike the defendant[] in *Lucasfilm* . . . is using the Mark not as a commentary on its owner, but instead as a source identifier." *United We Stand, 128 F.3d at 92*. The CWA has used Cellco's slogan as part of its commentary on Verizon, a company associated with the trademark, during its labor dispute with it. In contrast, the defendant in Jews for Jesus was alleged to have used his website to harm the plaintiff organization by disparaging it *and* appropriating its "source identifier," i.e., its trademarked name. In those circumstances the court held that the plaintiff had demonstrated the required likelihood of success as to its *15 U.S.C. § 1125(c)* trademark dilution claim. *Jews for Jesus, 993 F. Supp. at 308*.

The Court does not need to address the "likelihood of confusion" standard that **[*17]** would otherwise apply to Cellco's *15 U.S.C. § 1125(a)* false origination claim (Count I). The Count One claim, along with the other

three Lanham Act claims, does not satisfy the "use of the mark to identify goods or services" requirement, i.e., the "use in commerce" legal threshold. [3] The CWA's ads identify themselves as anti-Verizon, pro-union propaganda, thereby further differentiating this case from *Jews for Jesus* and *United We Stand.* Moreover, the union in *WHS* would appear far more culpable under the *Jews for Jesus* standard than the CWA: although the former's leaflets were drafted so as to inflict commercial harm on the restaurant, the union's dispute was with another company owned by one of the restaurant's partial owners. *WHS, 997 F. Supp. at 948.* Also, that union did not clearly identify itself as the sponsor of the flyers on their face. *Id.* Conversely, the slogan here is readily identifiable as being used within the pro-labor commentary against a company associated with it, Verizon, as part of the union's labor dispute with that same company. (Am. Compl. Exs. 2-12.)

**[*18]** Cellco argues that it is an innocent third party, whose good name has been tarnished by the CWA's use of its slogan, smearing it by linking it to Verizon's anti-employee practices. (*Id.* PP18-42 & 9-15-03 Cellco Arg. on Mot.) To the degree that this may result, it does not render the CWA's conduct actionable under the Lanham Act in these circumstances. First, each CWA message is expressly pro-union and anti-Verizon. (*See* Am. Compl. Exs. 2-12.) Second, the ads issued by the CWA are either labeled as such or otherwise identify their origin. (*See id.*) Third, Cellco has chosen to call itself "Verizon Wireless" in all of the "Test Man" ads that it has shown this Court. (Am. Compl. Ex. 1.) "Cellco" is nowhere mentioned in them. (*Id.*) There is thus only one way to construe these ads, even when the Court does so in Cellco's favor: that Cellco, as "Verizon Wireless," is identified with Verizon.

Cellco's harm on this score is essentially self-inflicted. Cellco chose to identify itself closely with Verizon, so

close as to give the following warning within a Prospectus, filed pursuant to SEC Rule 424(b)(3), concerning a 2003 exchange of its Notes:

> Because we market our **[*19]** products and services under the same name as Verizon Communications and other providers, . . . , our reputation and ability to attract and retain subscribers could be adversely affected if the reputation of Verizon Communications or those other providers were to decline.

(Def. Weissman Certif., Ex. A.) [4]

**[*20]** While the Court need not reach the "likelihood of confusion" standard, the very confusion alleged by Cellco stems from its close name identification with Verizon. Cellco's allegations of actual confusion focus on confused Cellco employees. (Am. Compl. PP35-40 & 9-15-03 Cellco Arg. on Mot.) The latter are "well aware that Cellco and [Verizon] are different entities." (Cellco Br. at 7.) One authority has noted that, "when the decision maker . . . weighs the issue of likelihood of confusion, it is not a question of whether the decision-maker would personally be confused, but whether the ordinary buyer in the marketplace would likely be confused." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:90 (4th ed. 2002). Ordinary consumers would not share the employees' particular confusion because they lack the latter's knowledge that the two companies are distinct. If "ordinary buyers" were confused, such was Cellco's doing. (*See* Am. Compl. P38). Likewise, any confusion stoked among Cellco's employees by the CWA's use of the slogan originates with Cellco calling itself "Verizon Wireless"; while regrettable, such also falls outside the scope of the Lanham Act.

**[*21]** Cellco's citing *Mercy Health Servs. v. 1199*

---

[3] To prove a violation under *15 U.S.C. §§ 1114* or *1125(a)*, a plaintiff must demonstrate that: (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000)*; *see also Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991)* (stating that the "defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services."). The plaintiff bears the burden of proof. *American Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 371 (3d Cir. 1987)*.

---

[4] Although the Prospectus is not a part of the pleadings, we take judicial notice of it, pursuant to Evidence *Rule 201*, as a "source[] whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b)(2)*. The Third Circuit has taken judicial notice of SEC filings pursuant to *Fed. R. Evid. 201(b)(2)*. *See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000)* (stating that a "number of our sister circuits have held that this rule permits a court, in deciding a motion on the pleadings, to take judicial notice of properly-authenticated public disclosure documents filed with the SEC."). The CWA has certified the authenticity of this document, which the Court has independently found on the SEC's website at: *http://www.sec.gov/Archives/edgar/data/1175215/0000950130 02007042/0000950130-02-007042.txt*

*Health and Human Serv. Employees Union, 888 F. Supp. 828 (W.D. Mich. 1995)* does not change this issue. (Cellco Br. at 7-9.) True, the court there had enjoined a union's advertisements on the grounds that the plaintiff hospital had shown that it was likely to succeed on its commercial defamation claims. *Id. at 834-38*. The difference, however, is that not only were the "Mercy Hospitals" possessing the same name independent entities, but the defendant union, engaged in a labor dispute with a New York Mercy Hospital, attacked the plaintiff in Michigan with ads based on the supposed actions of its New York counterpart, but without telling the Michigan audience where the acts occurred. *Id. at 835-36* (stating that the union had thereby "crossed the line from aggressive information dissemination to malicious defamation."). The *Mercy* union had smeared an innocent party sharing the name of its primary foe. Here, the CWA attacked its adversary directly; any suffering resulting to Cellco from the CWA's use of its slogan during the CWA's dispute with Verizon is a function of Cellco's voluntary close **[*22]** identity with its parent. (*See* 9-15-03 CWA Arg. on Mot.) [5]

We can agree with Cellco that the CWA has a strong economic motivation for its speech, which for the purpose of this motion, we will also assume to be CWA advertisements. *See, e.g., Va. Pharm. Bd. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)*. We note, however, that **HN9**[↑] the Supreme Court has observed the special status of speech in labor disputes:

> The **[*23]** interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the *First Amendment* when they express themselves on the merits of the dispute in order to influence its outcome. We know of no requirement that, in order to avail themselves of *First Amendment* protection, the parties to a labor dispute need address themselves to the merits of unionism in general or to any subject beyond their

immediate dispute.

*Va. Pharmacy Bd., 425 U.S. at 762-63*.

The CWA's media campaign was certainly more extensive than the personally-distributed handbills in *WHS* and *Sodexho. See also DeBartolo Corp. v. Fla. Gulf Coast Trades Council, 485 U.S. 568, 576, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988)* (stating handbills did not appear to be typical "commercial speech such as advertising the price of a product or arguing its merits," having pressed benefits of unionism to community and dangers of inadequate wages to economy and standard of living). Regardless of the medium used, the CWA's message as alleged in this case remains expression on the merits of a labor dispute, and therefore not actionable under **[*24]** the Lanham Act. [6]

The Court's reasoning on this motion is informed **[*25]** by the *First Amendment* but does not rely upon it. **HN10**[↑] "Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo, 485 U.S. at 575*. We believe that our construction of the Lanham Act in this context avoids the potential constitutional questions that enjoining or restricting the CWA's use of the Cellco slogan could entail. We believe that such a construction is also in line with how the Third Circuit has interpreted Congress's intent that the Lanham Act is properly focused on "anti-competitive conduct in a commercial context." *Conte Bros., 165 F.3d at 229*.

We hold that the CWA's use of a slogan, owned by Cellco but associated with Verizon, during its labor

---

[5] We assume that Cellco is effectively independent of its dominant shareholder parent. However, Verizon has not taken part in these proceedings even though Verizon's reputation is also at stake with the CWA's use of Cellco's slogan. Regardless, the *Mercy* court itself noted that it was not basing its grant of injunctive relief on the Lanham Act. *Mercy Health, 888 F. Supp. at 838* ("In any event, because of the previous findings and conclusions of the Court, a detailed analysis of the impact of the Lanham Act is not necessary for this Opinion.").

[6] A union commenting on its employer adversary through using the latter's slogan during a labor dispute would also not comprise a "parody" of the latter's specific services. However, its *First Amendment* right to do so, despite its admitted economic interest in the outcome, could be jeopardized by an overly-broad construction of the Lanham Act. *See Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1156 (C.D. Cal. 1998)* ("Applying the trademark dilution law to parodies such as the song *Barbie Girl* raises important *First Amendment* questions."), *aff'd, 296 F.3d 894 (9th Cir. 2002), cert. denied, 537 U.S. 1171, 123 S. Ct. 993, 154 L. Ed. 2d 912 (2003)*. Otherwise, a corporation could likewise "shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct, with detrimental consequences to free speech in this society." *Id. at 1156* (quotations and citations omitted).

dispute with Verizon as alleged, does not constitute "use in commerce" necessary for incurring liability under the Lanham Act. The Court will thus grant that part of the motion seeking to dismiss Counts One through Four of Cellco's Amended Complaint.

III. *Counts Five Through Nine: Supplemental State Claims*

Cellco **[*26]** brings five counts based upon New Jersey statutory and common law. It asserts that the Court has jurisdiction over these claims based on the "unfair competition" jurisdictional statute or under the federal courts' supplemental jurisdiction. *28 U.S.C. §§ 1338(b), 1367*.

*HN11*[↑] The jurisdiction conferred on the federal courts by *28 U.S.C. § 1338(b)* is "conditioned on a viable copyright or trademark claim arising under United States law." *Bridgeman Art Library, Ltd. v. Corel Corp., 25 F. Supp. 2d 421, 431 (S.D.N.Y. 1998)*. The Court, having dismissed the plaintiff's Lanham Act claims upon which it claimed federal jurisdiction, is thus not required to retain jurisdiction over Cellco's remaining state unfair competition claims, were any to survive the present motion, under *28 U.S.C. § 1338(b)*. For the purpose of this motion, however, the Court will exercise its discretion to retain jurisdiction under *28 U.S.C. § 1367* to consider Cellco's New Jersey statutory and common law claims.[7]

**[*27]** A. *Count Five: New Jersey Statutory Unfair Competition Claim*

Cellco alleges that the CWA's use of its trademarked slogan violated its rights under New Jersey's state unfair competition statute, *N.J.S.A. § 56:4-1*. (Am. Compl. PP75-78.) This states that: *HN12*[↑] "No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals."

*HN13*[↑] "*Section 56:4-1 of the N.J.S.A.* is [New Jersey's] statutory equivalent of *section [1125(a)(1)]* of the Lanham Act, and violation of that section leads to a finding of liability under 56:4-1." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 560-61 (D.N.J. 2002)*; *see Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 495 (D.N.J. 1998)* (stating

---

[7] The papers show that the parties may be diverse, justifying *28 U.S.C. § 1332* jurisdiction. (*See* Am. Compl. PP2-5.)

that *§ 56:4-1* is the statutory equivalent of *15 U.S.C. § 1125(a)* and that the two can be treated alike for analytical purposes).

The parties agree that the Court's analysis under either the Lanham Act or *Section 56:4-1* is the same. (CWA Br. at 38-39, Cellco **[*28]** Br. at 34-35.) Having failed to state a claim under *15 U.S.C. § 1125(a)*, Cellco's claim under *Section 56:4-1* also fails. *Eli Lilly, 23 F. Supp. 2d at 495*. Thus, the Court will grant that part of the motion seeking to dismiss Count Five of the Amended Complaint.

B. *Count Six: New Jersey Common Law Trademark Rights*

*HN14*[↑] The New Jersey unfair competition statute preserves the plaintiff's right to bring an unfair competition claim under New Jersey common law at *N.J.S.A. § 56:3-13.13*. This provision states that *HN15*[↑] "nothing herein shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law."

*HN16*[↑] "New Jersey's 'law of unfair competition is an amorphous area of jurisprudence. It knows of no clear boundaries . . . . The concept is as flexible and elastic as the evolving standards of commercial morality demand." *Duffy v. Charles Schwab & Co., Inc., 97 F. Supp. 2d 592 (D.N.J. 2000)* (quoting *N.J. Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc., 144 N.J. Super. 411, 427, 365 A.2d 956 (N.J. Super. Ct. Ch. Div. 1976))*. Yet,

> Although **[*29]** it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another--or property which has some sort of commercial or pecuniary value. The misappropriation usually takes the form of 'palming off' another's goods as your own, although the *modus operandi* is not essential.

*Duffy, 97 F. Supp. 2d at 600-01* (citation omitted); *see SK&F Co. v. Premo Pharm. Lab., Inc., 625 F.2d 1055, 1062 (3d Cir. 1980)* (stating that, under New Jersey common law there are two relevant torts of unfair competition, passing off one's goods or services as those of another, and unprivileged imitation). After an extensive discussion of these two torts, which had preceded its Lanham Act analysis, the Third Circuit has concluded that, *HN17*[↑] "except for the interstate

commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by [15 U.S.C. § 1125] are the same." Id. at 1066; see AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1433 (3d. Cir. 1994) [*30] (stating that "the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts."). While the Amended Complaint does not specify under which of the common law unfair competition torts set forth in SK&F Cellco's Count Six sounds, this claim falls squarely within the scope of both. (Am. Compl. PP79-85.)

The Court can conclude that, despite the potential reach of New Jersey's common law of unfair competition, in this context, the "federal law of unfair competition is not significantly different . . . from that of New Jersey." Birthright v. Birthright, Inc., 827 F. Supp. 1114, 1141 (D.N.J. 1993). Moreover, because Cellco only pleads under Count Six a cause of action for the CWA's "Infringement of State Common Law Trademark Rights," (Am. Compl. P79), it would hardly be unfair for us to treat the scope of its rights under New Jersey's common law of unfair competition as being equivalent to its rights under the Lanham Act. Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 91 F. Supp. 2d 733, 743 (D.N.J. 2000) (stating that the [*31] standard for common law trademark infringement and unfair competition in both New Jersey and Michigan mirrors the standards embodied in the Lanham Act"), aff'd, 263 F.3d 296 (3d Cir. 2001).

Because we have concluded that Cellco has failed to state any Lanham Act claim, it follows that the trademark infringement claim under New Jersey unfair competition common law also fails. The Court will thus grant that part of the motion seeking to dismiss Count Six of the Amended Complaint.

C. Count Seven: New Jersey Trademark Anti-Dilution Act

Cellco alleges that the CWA's use of its slogan violates its rights under New Jersey's trademark anti-dilution statute, N.J.S.A. § 56:3-13.20. (Am. Compl. PP86-90.) This states:

HN18[↑] The owner of a mark which is famous in this State shall be entitled, subject to the principles of equity, to an injunction, commencing after the owner's mark becomes famous, against another person's use of the mark which causes dilution of the distinctive quality of the owner's mark, and to

obtain other relief provided in this section. In determining whether a mark is famous, a court may consider factors such as, but not [*32] limited to:

a. The degree of inherent or acquired distinctiveness of the mark in this State;

b. The duration and extent of use of the mark in connection with the goods and services;

c. The duration and extent of advertising and publicity of the mark in this State;

d. The geographical extent of the trading area in which the mark is used;

e. The channels of trade for the goods or services with which the registrant's mark is used;

f. The degree of recognition of the registrant's mark in its and in the other's trading areas and channels of trade in this State; and

g. The nature and extent of use of the same or similar mark by third parties.

This last claim arising from New Jersey unfair competition law also fails. The coverage of the quoted statute "appears to be the state-law equivalent of Section 1125(c)." Jews for Jesus, 993 F. Supp. at 311. As Cellco has failed to state a Lanham Act claim, including its federal trademark dilution claim from Count Four brought under 15 U.S.C. § 1125(c) of the Lanham Act, Cellco's state trademark dilution claim under § 56:3-13.20 also fails. The Court will grant that part of the motion seeking dismissal [*33] of Count Seven of the Amended Complaint.

D. Count Eight: Defamation

HN19[↑] Whether a statement is defamatory under New Jersey law is a matter of law to be determined by the Court. Higgins v. Pascack Valley Hosp., 158 N.J. 404, 426, 730 A.2d 327 (1999). Generally, a statement is defamatory if it is false, is communicated to a third person and tends to harm the plaintiff's reputation or deters third persons from associating with the plaintiff. Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164-165, 735 A.2d 1129 (1999). Because Cellco is a public figure, it must also show the CWA's actual malice by clear and convincing evidence, i.e., that the CWA "either knew that the statement was false or published with reckless disregard for the truth." Id. [8]

_____

[8] Cellco is, at minimum, a "limited purpose public figure." Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1077 (3d Cir. 1988) ("The second and more common type of public figures are limited purpose public figures, who, although they are not well known throughout the country or on every issue, are nonetheless sufficiently involved in one particular arena to

[*34]  _HN20_[⬆] "For a libel action to qualify, the disputed statement must be an assertion of fact. _Dunn v. Gannett N.Y. Newspapers, Inc., 833 F.2d 446, 449 (3d Cir. 1987)_. The alleged circumstances surrounding the publication must show that the statements were "of and concerning" the plaintiff. _Printing-Mart Morristown v. Sharp Elec. Corp., 116 N.J. 739, 768, 563 A.2d 31 (1989)_. "It must appear that a third person understood the statements to relate to the plaintiffs." _Id._ However, "the actual naming of a plaintiff is not a necessary element in an action for libel. It is enough that there is such reference to him that those who read or hear the libel reasonably understand the plaintiff to be the person intended." _Dijkstra v. Westerink, 168 N.J. Super. 128, 133, 401 A.2d 1118 (App. Div. 1979)_.

Cellco alleges that the CWA's use of its slogan defames it because the "CWA knew of the falsity of its ad campaign's implications with respect to Cellco's labor practices and conduct during a labor dispute." (Am. Compl. P94 & 9-15-03 Cellco Arg. on Mot.) Cellco does not allege that the CWA's propaganda has mischaracterized Verizon or the latter's labor practices. (_See_ Am. Compl. [*35] PP35-42, 61-63 & 92-98.) Verizon is not a party to these proceedings and does not contest how it has been portrayed. The defamation,

---

qualify as public figures for that purpose"). For instance, Cellco alleged that, as "Verizon Wireless", it has spent some $ 200 million on ads just in support of its slogan. (Am. Compl. P14.)

The Court need not address the CWA's argument that the NLRA, _see supra_, n.2, preempts Counts Eight and Nine. (CWA Br. at 49-52.) The NLRA does not preempt defamation claims in the labor context where a plaintiff can show "actual malice" and damages. _See Linn v. United Plant Guard Workers, 383 U.S. 53, 64, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966)_. This is the same "_New York Times_" standard of malice New Jersey applies to public figures. _See Lynch, 161 N.J. at 165_ (citing _N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964))_.

If a public figure states a defamation claim under New Jersey law, that claim should thus also pass the preemption hurdle. The same can be said for a tortious interference with contract claim, the basis of Cellco's Count Nine. _See Beverly Hills, 39 F.3d at 196_ ("we note the malice standard required for actionable defamation claims during labor disputes must equally be met for a tortious interference claim based on the same conduct or statements.").

Because we otherwise hold that Cellco states claims for neither defamation nor tortious interference with contract under New Jersey law, we do not need to reach the preemption issue.

---

if any, is in the CWA's linking of Cellco to its parent company's labor practices.

Cellco's claim is insufficient as a matter of law. A third person could only reasonably understand that the statements were intended to refer to "Verizon," not "Cellco." This results from Cellco's voluntary close identification with Verizon: Cellco identifies itself as "Verizon Wireless" and uses that name when supporting its slogan with its "Test Man" ads. (Am. Compl. Ex. 1.) A reasonable third-person would link Cellco to Verizon's labor practices because Cellco has not told the public that it exists as a separate entity under that name, and would thus understand the CWA's statements as relating to "Verizon," including "Verizon Wireless." _Printing-Mart, 116 N.J. at 768_. The CWA did not make a false statement of fact, but merely highlighted a link that Cellco itself created. Any harm to Cellco's reputation arising from the labor dispute was self-inflicted. _See also supra,_ § II.

We do not reach the further "threshold inquiry" of whether the language [*36] used by the CWA is "reasonably susceptible" to a defamatory meaning. _See Ward v. Zelikovsky, 136 N.J. 516, 528, 643 A.2d 972 (1994)_. The Court will grant that part of the motion seeking dismissal of Count Eight of the Amended Complaint.

E. _Count Nine: Tortious Interference with Contract_

New Jersey's Appellate Division states:

_HN21_[⬆]] To establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage.

_Dello Russo v. Nagel, 358 N.J. Super. 254, 268, 817 A.2d 426 (App. Div. 2003)_.

Cellco alleges that the CWA had adopted its slogan "with the intention of encouraging [union members or supporters] to breach or terminate their contracts" with it. (Am. Compl. P101.) The complaint thus alleges facts claiming that the CWA's interference was done intentionally and with malice. _Printing-Mart, 116 N.J. at 751_. _HN22_[⬆] "Malice" means that the harm was inflicted intentionally and without justification [*37] or excuse. _Id. at 751, 756_. The burden is on the plaintiff to demonstrate a lack of justification or excuse. _Id. at 756_.

2003 U.S. Dist. LEXIS 26823, *37

The Eighth Circuit has affirmed an order granting a defendant union's motion for summary judgment dismissing a supermarket's tortious interference with contract claims against it for having organized a consumer boycott. *Beverly Hills, 39 F.3d at 196-97*. The district court had reasoned that *HN23*[↑] "Informational and 'area standards' picketing and non-violent boycotts against the primary employer are *First Amendment* activities protected under the federal labor laws." *Beverly Hills Foodland v. United Food Workers, 840 F. Supp. 697, 706 (E.D. Mo. 1993)*, aff'd, *39 F.3d 191 (8th Cir. 1994)*. The Eighth Circuit noted that the *First Amendment* protection enjoyed by peaceful pamphleteering "is not diminished where the communications are intended to exercise a coercive impact." *Beverly Hills, 39 F.3d at 197*. It affirmed the district court's order to both the tortious interference counts alleging malice and those that did not. *Id.*

The CWA is as deserving of *First Amendment* protection **[*38]** as the union in *Beverly Hills,* if not more so. Cellco grounds its claim in the CWA's having used its slogan with the alleged intent of disrupting its customer relationships. (Am. Compl. P101.) In *Beverly Hills,* the union distributed handbills asking patrons not to shop at the plaintiff's supermarket because of its allegedly discriminatory hiring practices. *39 F.3d at 195*. Conversely, the CWA did not overtly call for any boycott, whether of Verizon or Verizon Wireless. (Am. Compl. Exs. 2-12.) At worst, it asked the public to telephone Verizon's allegedly "greedy" executives and tell them that "layoffs are no answer." (Am. Compl. Ex. 11.)

The CWA has the right to make this plea, even if its message incorporates Cellco's slogan and thus potentially has a "coercive impact" on Cellco as well as Verizon. If a full boycott by the CWA against Verizon would have been justified, statements having the mere effect of encouraging pro-union consumers to not deal with "Verizon" are also justifiable. We can assume that the ads allegedly affected Cellco's own customer relationships. Yet, this is a function of Cellco's own choice in identifying itself with Verizon as "Verizon Wireless. **[*39]** " *See supra,* §§ II & IIID. Having done so, it cannot complain about becoming a target of the CWA.

Cellco thus fails to state a tortious interference with contract claim. Verizon and the CWA were involved in a labor dispute, and it was in this context that the CWA used Cellco's slogan. *See supra,* § II. The Court will grant that part of the motion seeking dismissal of Count Nine of the Amended Complaint.

**IT IS THEREFORE** on this 4th day of December, 2003 **ORDERED** that defendant's motion to dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* (no. 34-1 on the docket) be and hereby is **GRANTED;** and

**IT IS FURTHER ORDERED** that the complaint be and hereby is **DISMISSED** in its entirety; and

**IT IS FURTHER ORDERED** that the Clerk of the Court designate the action as **CLOSED.**

**MARY L. COOPER**

United States District Court

**End of Document**



No *Shepard's* Signal™
As of: December 27, 2022 9:24 PM Z

## *Silgan Containers LLC v. Int'l Ass'n of Machinists & Aero. Workers*

United States District Court for the Eastern District of Wisconsin

November 8, 2018, Decided; November 8, 2018, Filed

Case No. 18-C-213

**Reporter**

2018 U.S. Dist. LEXIS 191308 *; 2018 L.R.R.M. 413945; 2018 WL 5840766

SILGAN CONTAINERS LLC, Plaintiff, v. INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Defendant.

## Core Terms

trademark, infringement, employees, labor dispute, injunctive relief, motion to dismiss, factors, unionize, second amended complaint, likelihood of confusion, consumer confusion, containers

**Counsel:** [*1] For Silgan Containers LLC, Plaintiff: Jeunesse Rutledge, David G Hanson, Reinhart Boerner Van Deuren SC, Milwaukee, WI.

For International Association of Machinists and Aerospace Workers AFL-CIO, agent of, IAM, Defendant: Barbara Z Quindel, Richard Saks, Hawks Quindel SC, Milwaukee, WI; Michael T Smith, Robert J Kenney, Birch Stewart Kolasch & Birch, Falls Church, VA.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Plaintiff Silgan Containers LLC (Silgan), a Delaware limited liability company engaged in the business of manufacturing metal food packaging, claims Defendant International Association of Machinists and Aerospace Workers, AFL-CIO (IAM), an international labor organization, infringed Silgan's trademarks by using them in social media posts intended for Silgan employees at a manufacturing facility within this judicial district. Silgan claims IAM's use of its trademarks violates the *Lanham Act* because it is likely to cause consumer confusion or deception and deceive consumers as to the source of the allegedly infringing images. The principal relief Silgan seeks is a permanent injunction enjoining IAM from using **[*2]** the Silgan trademark and damages for IAM's infringement. This court has jurisdiction over the claims under *28 U.S.C. §§ 1331*, *1338*, and *15 U.S.C. § 1121*. This matter comes before the court on IAM's motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* for failure to state a claim upon which relief can be granted. ECF No. 21. For the reasons that follow, the motion to dismiss will be granted.

### BACKGROUND

The following facts are taken from the Second Amended Complaint (SAC) and are presumed true for purposes of deciding the motion before the court. Silgan owns U.S. Federal Trademark Registrations Nos. 1722008, 1689822, 1742109, 3244912, 3242483, 3258317, and 3242493 for SILGAN—all of which are in good standing—for use with containers made of synthetic resins, containers made of non-precious metal, machines for automatically applying caps and closure caps to containers, as well as metal and non-metal closure caps for containers and bottles. ECF No. 3-3. Below are examples of the SILGAN trademark:





ECF No. 1-1. Silgan claims that IAM, in an effort to

organize Silgan employees to vote in favor of unionizing, created the allegedly infringing images that use the SILGAN trademark for use on social media platforms, such as Facebook and Twitter. Below are examples of IAM's allegedly infringing use of the SILGAN trademark:



ECF 1-2 at 1, 4. **[*3]** Silgan has not authorized IAM or any other third party to use its trademarks in connection with the allegedly infringing images.

Silgan filed an initial complaint on February 8,2018. Silgan subsequently amended its complaint twice, filing its Second Amended Complaint on August 7, 2018. ECF No. 18. In lieu of an answer, IAM filed a motion to dismiss for failure to state a claim on August 28, 2018. ECF No. 21.

## LEGAL STANDARD

A motion to dismiss under *Rule 12(b)(6)* challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See Fed. R. Civ. P. 12(b)(6)*. *Rule 8(a)(2)* mandates that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The Supreme Court has held that a complaint must contain factual allegations which are enough "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. In ruling on a motion to dismiss under *Rule*

*12(b)(6)*, a court must view the plaintiff's factual allegations and any inferences reasonably drawn from them in a light most favorable to the plaintiff. *Yasak v. Retirement Bd. of the Policemen's Annuity and Benefit Fund of Chi., 357 F.3d 677, 678 (7th Cir. 2004)*.

[IAM presen]ts three arguments in support of its motion to [dismiss: (1)] the Norris-LaGuardia Act deprives the court [of jurisdic]tion to issue injunctive relief in cases [_____] to labor disputes; (2) Silgan's likelihood of [_____] claim is not plausible; and (3) Silgan's [complaint] fails to establish IAM's use of the SILGAN [_____] was commercial use.

[____ctive] Relief and the Norris-LaGuardia Act

[____s] that the Court does not have jurisdiction to [____] ctive relief because this action is intrinsically [____] a labor dispute between the two parties. [____erts] that their complaint is solely about IAM's [____fringement] of their trademark, and thus [____] purview of the *Norris-LaGuardia Act*.

The Norris-LaGuardia Act states that no federal court shall have jurisdiction to enter injunctive relief "in a case involving or growing out of a labor dispute" nor "contrary to the public policy declared in this chapter." *29 U.S.C. § 101*. Under the Act, a labor dispute "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." *29 U.S.C. § 113*.

IAM relies on *Marriott Corp. v. Great America Service Trades Council, AFL-CIO, 552 F.2d 176 (7th Cir. 1977)*, to support its argument that this case **[*5]** is related to a labor dispute. In *Marriott*, the plaintiff sought to enjoin the defendant labor organization from using the plaintiff's service mark, "Marriott's Great America," after the defendant published a newspaper ad directed at potential employees of the plaintiff under the name "Great America Service Trades Council, AFL-CIO." *Id. at 178*. Although the controversy was "couched in terms of trademark infringement" by the plaintiff, the Court, quoting the Supreme Court, held that "it is necessary to inquire beyond the form or appearance of a dispute to

its 'relative impact on . . . the interests of union members.'" *Id. at 179* (quoting *Am. Fed'n of Musicians v. Carroll, 391 U.S. 99, 107, 88 S. Ct. 1562, 20 L. Ed. 2d 460 (1968)).* In its further inquiry, the Court found that the "injunctive relief was directed against the [defendant's] choice of name, which is intertwined with those efforts, legitimate labor objectives." The Court further elaborated:

> The choice of a particular name by a labor organization may very well facilitate its organizational drive to represent the employees of a particular employer. The name may serve to identify and publicize the employer which is the target of the campaign and to instill a measure of collective identity among employees. Such aims are legitimate union objectives **[*6]** in seeking the right to self-organization of employees under *section 7 of the Labor Management Relations Act*.

*Id. at 179-80.* The Court therefore held that injunctive relief was not available to the plaintiff, and reversed the district court's order granting such relief.

Arguing that the present case does not stem from a labor dispute, Silgan points to *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago, 856 F. Supp. 472 (N.D. Ill. 1994).* There, the plaintiff sought a preliminary injunction against the defendant, a coalition that included labor unions whose goal was to prevent the plaintiff from closing a factory, for the sole purpose of enjoining the defendant from using the plaintiff's logo while still allowing the defendant to use the plaintiff's name. *Id. at 474, 476.* In granting the injunction, the Court noted that the defendant neglected to explain how the activities met the definition of a labor dispute, and relied on *Brotherhood of R. Trainmen v. New York C.R. Co., 246 F.2d 114 (6th Cir. 1957)*, which held that "objection to the closing of a railroad yard was not a labor dispute." *Id. at 477.*

Although Silgan argues that it "is not using a trademark dispute to challenge or shut down the IAM organization efforts," Pl.'s Resp. at 9, ECF No. 23, looking beyond the form of Silgan's claim it is apparent that the impact of the dispute on the interests of union members is significant. Silgan **[*7]** acknowledged as much in its second amended complaint, stating that "the Infringing Images will affect ongoing labor relations between IAM and Silgan." ECF No. 18, ¶ 22. In addition, unlike the plaintiff in *Brach*, Silgan seeks to enjoin IAM from using its name in any materials IAM produces. As noted in *Marriott*, a labor organization's name helps foster a collective identity and depriving IAM the use of Silgan's name would interfere with legitimate union objectives. While it may not be Silgan's intention to interfere with IAM's organization efforts through enforcement of its trademarks, here interference is unavoidable. As a result, this court does not have subject matter jurisdiction over Silgan's prayer for injunctive relief and those claims are dismissed.

## B. Consumer Confusion

IAM also argues that Silgan's infringement claims must fail more generally because Silgan's claim that IAM's use of the SILGAN trademark could result in consumer confusion is implausible. Silgan counters that Silgan's use could result in confusion regarding Silgan's affiliation, endorsement, or approval of IAM's attempt to unionize its employees.

"Allegations of consumer confusion in a trademark suit, just like **[*8]** any other allegations in any other suit, cannot save a claim if they are implausible." *Fortres Grand Corp. v. Warner Bros. Entm't Inc., 763 F.3d 696, 700 (7th Cir. 2014).* "[G]eneral confusion 'in the air' is not actionable. Rather, only confusion about 'origin, sponsorship, or approval of . . . goods' supports a trademark claim." *Id. at 701* (citing *15 U.S.C. § 1125*). When considering the plausibility of such an allegation, a court should consider the following seven-factor test:

> [1] the degree of similarity between the marks in appearance and suggestion; [2] the similarity of the products for which the name is used; [3] the area and manner of concurrent use; [4] the degree of care likely to be exercised by consumers; [5] the strength [or "distinctiveness"] of the complainant's mark; [6] actual confusion; and [7] an intent on the part of the alleged infringer to palm off his products as those of another.

*Id. at 702* (quoting *McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1167-68 (7th Cir. 1986)).* "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1087 (7th Cir. 1988).* "As a consequence, the 'weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether **[*9]** the majority of the factors tilt the scale in favor of one side or the other.'" *Ty, Inc. v. Jones Grp.,*

*Inc.,* 237 F.3d 891, 898 (7th Cir. 2001) (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1187 (7th Cir.1989)).* Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the "most important factors" in a likelihood of confusion case. *Id.* (citing *G. Heileman Brewing Co., Inc. v. Anheuser—Busch, Inc., 873 F.2d 985, 999 (7th Cir.1989)).*

Assessing the factors, the court is convinced there is no plausible likelihood of confusion. IAM is not using the SILGAN trademark as a source identifier for its services or to sow confusion as to whether Silgan approves or is affiliated with IAM's efforts, but rather to identify Silgan as the employer of the employees IAM is attempting to unionize. Unlike the organization in *Brach*, IAM is not using a close copy of the SILGAN trademark or logo, but instead merely using the name "Silgan" as an identifier of the employer of the employees it seeks to assist in unionizing. IAM is not offering a competing product or service, and IAM's use is limited solely to social media platforms in conjunction with its attempt to organize employees. Further, Silgan has not alleged nor provided any evidence of instances of actual confusion in its complaint.

Silgan's **[*10]** claim that "IAM's practice of overlaying its logo over the Silgan Trademarks causes confusion by conveying the appearance of approval or endorsement," Pl.'s Resp. at 14, ECF No. 23, rings hollow upon actual examination of IAM's allegedly infringing use on social media. Looking at the IAMSilgan Facebook page[1], IAM clearly identifies itself as a labor union. ECF No. 3-4 at 1. One of the posts on the Facebook page states the following: "We have already received reports that Silgan management has started with their scare tactics . . . . Should management continue to threaten Silgan workers, the Union stands ready to file charges with the National Labor Relations Board." *Id.* at 3. "[T]he question is not whether anyone who might view the marks would be confused; rather, the relevant class consists of consumers who might purchase either the plaintiff's or the defendant's products or services." *Epic Sys. Corp. v. YourCareUniverse, Inc., 244 F. Supp. 3d 878, 889 (W.D. Wis. 2017)* (citing *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc., 653 F.3d 448, 455 (7th Cir. 2011)).* Here, it is not plausible that the relevant consumers—Silgan employees—are likely to confuse IAM's use of Silgan as a sign that Silgan

endorses IAM's efforts given the content and other indentifying information on the Facebook page and Twitter account.

In considering the totality of the circumstances, **[*11]** it is also important to consider the juxtaposition of the parties. Confusion is even less likely to occur here in the context of an attempt to unionize laborers given the inherent adversarial relationship between IAM and Silgan in such a situation. *See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 203 (1st Cir. 1996)* (finding that defendant's use of identical reproductions of IAM's on pamphlets distributed to union members during a campaign to unionize defendant's employees would not cause confusion in part because of the labor dispute setting and contentious nature of such disputes). Having considered the factors, the court finds that Silgan's second amended complaint fails to allege facts sufficient to plausibly establish consumer confusion, a necessary element for both of Silgan's trademark infringement claims. As a result, the court need not address IAM's argument that its use was not use in commerce and will dismiss Silgan's second amended complaint.

## CONCLUSION

For the foregoing reasons, IAM's motion to dismiss (ECF No. 21) is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED** this 8th day of November, 2018.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

---

---

[1] The Facebook page changed after Silgan filed their initial complaint, and is now IAM at Silgan rather than IAM Silgan.